UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YAYA JALLOW,

                     Plaintiff,

           -against-

EDWARD I. GEFFNER, PROJECT RENEWAL,
ET AL.,

                   Defendants.

23-CV-3969 (LTS)

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District Judge:

Plaintiff, who is appearing *pro se*, brings this action invoking the Court's federal question jurisdiction and alleging that Defendants violated his rights. By order dated May 15, 2023, the Court granted Plaintiff's request to proceed *in forma pauperis* ("IFP"), that is, without prepayment of fees.

For the reasons set forth below, the Court (1) severs the claims that arose in Brooklyn, New York, and transfers those claims to the United States District Court for the Eastern District of New York; (2) dismisses all of Plaintiff's remaining claims except for the excessive force claim arising from events that occurred at Manhattan Central Booking; and (3) grants Plaintiff leave to file an amended complaint with respect to the excessive force claim within 60 days of the date of this order.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also

dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id*. at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

## BACKGROUND

Plaintiff brings this action alleging that he is the "victim of an enterprise that would engage in several racketeering activities at [his] expense," with the goal "to deliberately and intentionally harm, endanger, destitute, disenfranchise, and ultimately murder him while also attempting to portray him as a mentally unstable, retarded, sexists, bigoted, unenfranchised immigrant."[1] (ECF 1, at 5.) This wide-ranging conspiracy encompasses his interactions with the New York City shelter system, the New York City Police Department ("NYPD"), the New York State Unified Court System, and the New York City Department of Correction ("DOC"). Named as Defendants are: (1) State of New York; (2) Letitia James, Attorney General of the State of New York; (3) Edward I. Geffner, an agent of Project Renewal; (4) Project Renewal; (5) Leticia Randle, Program Director of Project Renewal Kenton Hall shelter; (6) Robert Lashley, Program

---

[1] The Court quotes from the complaint verbatim. All spelling, grammar, and punctuation are as in the original unless otherwise noted.

Director of Project Renewal Third Street shelter; (7) Samaritan Daytop Village, Inc.

("Samaritan"); (8) Yvelyse Marrero, Program Director of Samaritan shelter; (9) John McDonald,

agent of The Doe Fund; (10) The Doe Fund; (11) Rogers Avenue Housing Development Fund

Corporation ("Rogers Avenue HDFC"); (12) DOC; (13) Louis A. Molina, Commissioner of

DOC; (14) David Terrel, DOC Correction Officer; (15) Joshua Maye, officer at the NYPD 9th

Precinct; (16) Raheen Rivers, officer at the NYPD 9th Precinct; (17) Lawrence McKenzie, staff

member at Samaritan; (18) David Bell, staff member at Samaritan; and (19) Milton E. Calderon,

officer at NYPD 75th Precinct. Plaintiff seeks money damages.

The following information is taken from the complaint.[2] On May 9, 2019, Plaintiff was

arrested after an "MTA fare evasion entrapment scheme, something that was planned since [he]

was an infant,"[3] (*Id*. at 6 ¶ 2.) In 2021 and 2022, Plaintiff, who had lived for 23 years without a

criminal record or any interactions with the police, "magically amass[ed] countless cases,

charges, and warrants levied against him." (*Id*. ¶ 4.) He attributes the charges to intentional

efforts "to hinder, slander, smear, and railroad [him] all under the ruse of the '[judicial

[p]rocess.'" (*Id*. at 7 ¶ 4.)

---

[2] Plaintiff refers to exhibits and provides an "exhibit list," but no exhibits are attached to the complaint. (ECF 1, at 21 7-8.)

[3] Plaintiff previously filed an action in this court in which he asserted false arrest claims arising from the May 9, 2019 arrest. On December 21, 2021, Judge Lorna G. Schofield granted the City of New York's motion to dismiss that action but directed Plaintiff to seek leave to replead. *See Jallow v. City of New York*, ECF 1:20-CV-6260, 64, 2021 WL 6052125 (S.D.N.Y. Dec. 21, 2021). Because Plaintiff did not seek permission to replead, the action was dismissed on February 4, 2022. *See id*., ECF 1:20-CV-6260, 65.

**A.      Incidents at Kenton Hall Shelter and April 28, 2022 Arrest**

In the spring of 2022,[4] Plaintiff was transferred from a shelter in Brooklyn, to Project Renewal's Kenton Hall shelter in Manhattan, which is supervised by Defendant Leticia Randall. At Kenton Hall, the staff display[ed] a lack of care and respect" towards Plaintiff, which included refusing to change his designated bed after he informed them of an "attempted knife robbery," and denying him an overnight pass for late night work in an "attempt to cost [him] his job." (*Id.* ¶¶ 6-7.) On April 24, 2022, a staff member "accosted and egged [him] . . . into a possible altercation," but Plaintiff attempted to defuse the situation by "punching a door's glass window instead of the "[s]taff's face." (*Id.* ¶ 8.) The shelter staff called the police, who transported Plaintiff to the hospital for treatment of cuts to his hand. When Plaintiff returned to the shelter, he learned that he had been transferred to another shelter around the corner, Project Renewal's Third Street Shelter. Plaintiff retrieved his belongings, only to find that his bag of electronics, which had been in his locked backpack, was missing. When he inquired about the missing electronics, he was told that there was an in-house policy regarding electronics, and that he could retrieve them the following Tuesday, six days later. Plaintiff asserts that "due to the actions of said [c]riminal [e]nterprise that wouldn't happen." (*Id.* at 8 ¶ 10.)

Four days later, on April 28, 2022, Officers Joshua Maye and Raheen Rivers arrested Plaintiff for breaking the window at Kenton Hall. Plaintiff asserts his belief that the arrest "was the start of said [e]nterprise choosing to depict [him] explicitly as a criminal nigger, with the arrest allowing said [e]nterprise the ability to 'legitimize' their discrimination and

---

[4] There appears to be some discrepancies with respect to the dates Plaintiff provides in the complaint. Although he asserts that he arrived at Kenton Hall in November 2022, he refers to alleged violations at that shelter, which occurred in April 2022. The Court therefore assumes that Plaintiff was transferred to Kenton Hall in the spring of 2022.

disenfranchisement of [him]." (*Id*. at 9 ¶ 13.) He also claims that he was not read his *Miranda* rights and that the arrest was a "form of kidnapping." (*Id*.)

## B.    Incidents at Manhattan Central Booking

After several hours at the NYPD 9th Precinct, Plaintiff was transferred to Manhattan Central Booking, where he was "accosted by an inmate who would provoke a fight." (*Id*. ¶ 14.) In response, Corrections Officer David Terrel and four other correction officers "force[ed] [] Plaintiff into fighting them after repeatedly initiating and ignoring several refusals by [] Plaintiff not to fight them." (*Id*.) Plaintiff fought the five correction officers, and after "getting his ass beat Officer Terrel would respond by slamming [him] and breaking 3 of his ribs and applying his whole-body weight on [] Plaintiff, in a clear-cut murder attempt just like George Floyd." (*Id*.) Afterwards, Plaintiff was charged with "trumped up charges of assaulting a [p]eace [o]fficer" despite the officers initiating the fight with everyone consenting. (*Id*.) Plaintiff asserts that this incident was an "apparent [] scheme to felonize [him] so to allow said [e]nterprise to continue their destitution and disenfranchisement campaign all under the 'legal' gauze of him being a felon." (*Id*.)

Plaintiff's appearance before a judge was pushed back for a day because of the new charges. When he finally saw the judge, the judge used the new charges and an April 13, 2022 missed court date as grounds to send him to Rikers Island.

## C.    Incidents at Rikers Island

Plaintiff was detained at Rikers Island for 36 days, where he became "a victim of the continuation of the [c]orrections [] [o]fficers['] deliberate and intentional endangerment and murder schemes and tactic all while portraying him as the aggressor and perpetrator[]." (*Id*. at 10 ¶ 16.). On an unspecified date, he went to court and accepted a plea deal, which would "adjudicate and close all open and active cases against him." (*Id*. ¶ 17.) When Plaintiff returned

to his housing area at Rikers Island, he found his mattress had been stolen and no food had been saved for him, despite DOC's policy to hold all meals for a prisoner at court. Plaintiff believes this was a "clear attempt to starve and murder [him] just like Jordan Neeley." (*Id.*) Plaintiff knew the identity of the person who had taken his mattress and confronted him, which led to a fight. After the fight, Plaintiff was transferred to a "perpetually freezing" dorm "without adequate clothing and/or blankets," which he asserts was an "attempt to freeze him to death, all while not being provided any food." (*Id.*)

The next day at breakfast, Plaintiff got into another fight with several other prisoners when his milk was stolen, and his face was cut by a shank. Plaintiff was then transferred to another dorm, where his property was stolen while he watched a basketball game. After that incident, he was again transferred to a different housing area where he got "jumped by the whole dorm for inquiring about his stolen food." (*Id.*) Plaintiff believes that correction officers placed him in danger while protecting the other prisoners involved in these incidents. He filed multiple grievances about these incidents, but none were adequately addressed.

## D. June 3, 2022 Arrest

On June 3, 2022, Plaintiff was released from custody, and made his way back to the NYPD 9th Precinct for his "vouched property." (*Id.* ¶ 18.) At the precinct, he learned that a warrant had been issued against him on April 14, 2022, the day after the missed court date; the warrant turned out to be an "I-Card hold" issued out of the NYPD 78th Precinct in Brooklyn. (*Id.* at 11 ¶ 18.) Plaintiff expresses skepticism that the warrant "magically manifest[ed]" in the two hours it took for him to travel from Rikers Island to the 9th Precinct on the Lower East Side of Manhattan, and that the NYPD could not locate him or inform him of the warrant beforehand, pointing out: (1) the April 28, 2022 arrest by the NYPD, which occurred after the warrant was

issued; and (2) he was in DOC custody for 36 days, during which time he had multiple background checks. (*Id.*) Plaintiff was arrested pursuant to the warrant.

After the arrest, Plaintiff was brought to the holding cell area of the police station, where Supervising Officer Berrios, who is not named as a defendant, directed Plaintiff to sit and proceeded to question him. When Plaintiff did not answer Berrios's questions, the officer placed his hands on Plaintiff's chest and "use[d] excessive force to force him into sitting down." (*Id.* ¶ 21.) Berrios then directed Plaintiff to remove his shoes, and he attempted to put Plaintiff in a holding cell with handcuffs on. Plaintiff asserts that this was a "possible attempt to have [Berrios's] informant attack and possibly kill [him]." (*Id.*) Plaintiff was transported to 78th Precinct, where he was held for an additional eight hours before he saw a judge and another court date was scheduled.

Because Plaintiff was released from custody at night, he was unable to get a shelter bed. He returned to the NYPD 9th Precinct to retrieve his property, but was told that it was now at 1 Police Plaza, which was closed. Plaintiff was left stranded without a cellphone, wallet, or clothes. He was forced to walk around the city in "prison scrubs in a scheme to invalidate a jury and emotional[ly] harass [him]." (*Id.* at 12 ¶23.)

## E.    Incidents at Third Street Shelter

Plaintiff returned to the Third Street shelter, only to be told that he was no longer in their system. He had to go to the HRA Intake Center, where he was again assigned to Third Street shelter. Plaintiff went back to the shelter and got a bed, but he was not given the property he had left there. Plaintiff filed complaints with Project Renewal and various city agencies about the alleged theft of his property and other issues with shelter staff.

On June 14, 2022, Plaintiff returned to the shelter at 4am, the same time he had returned on the previous eight days. Although he had an overnight pass, he was told that his bed had been

taken for missing curfew and to wait downstairs. He ignored the staff and went upstairs, only to find his belongings packed. Plaintiff spent the next three days "forced to sit and sleep downstairs, causing back and body pain and harm." (*Id*. at 14 ¶ 37.) Shelter staff informed him they were looking for a bed, but Plaintiff believes it was an "obvious scheme to enrage [him] into attacking them so they could get him arrested and validate their secondary theft." (*Id*.)

On June 15, 2022, Plaintiff went to the New York City Department of Homeless Services ("DHS") to report the shelter staff's actions. DHS staff appeared to condone the shelter staff's conduct, stating that they "didn't care what [] Plaintiff was forced to endure" and lying to him about the transfer protocols for shelters. (*Id*. ¶ 39.) After Plaintiff called them out on the lie, DHS staff called security and threatened to call the NYPD. Plaintiff asserts that this was an "obvious racial dog whistle" even though the staff shared his race. (*Id*.) DHS refused his transfer request from the Third Street shelter, although the shelter staff "was attempting to starve and murder him." (*Id*.)

On June 18, 2022, Plaintiff went to the HRA Intake Center and learned that he had been removed from the DHS shelter system under the "ruse" that he hadn't been there for eight days. (*Id*. ¶ 41.) Plaintiff believes that is was another attempt by the Third Street shelter staff to steal his remaining property. He eventually got a message from a DHS representative that he had been transferred to Samaritan Daytop shelter in Brooklyn. During the course of these events, Plaintiff submitted complaints to multiple state and city agencies, but most of them "ignored or brushed off" his complaints, further "emboldening and enabling" the criminal enterprise against him. (*Id*. at 15 ¶ 42.)

**F.    Incidents Occurring while Plaintiff Resided in Brooklyn, New York**

Over the course of the next couple of months, Plaintiff alleges that he faced discriminatory treatment by multiple entities and individuals while residing in Brooklyn,

including: (1) problems accessing his bank account with Axos Bank; (2) not receiving his 2019 state tax refund from the New York State Department of Finance; (4) mail tampering by unspecified persons; (5) employment discrimination at his new job with the Ribbon Restaurant, including his firing; (6) delay in approval of unemployment insurance benefits; (6) "being blackballed and discriminated in the New York Restaurant Industry" (*id*. ¶at 16  52) (7) refusal of HRA Brooklyn office to provide him services; (8) fraudulent charges against his Robinhood brokerage account; (9) denial of SNAP application for the third time; (10) "racial service refusal" by the Smoke Shop (*id*. at 17 ¶ 66); and (11) denied kitchen access and subjected to racketeering activities after renting a room from the Rogers Avenue HDFC, which is operated in conjunction with the Doe Fund.

In April 2023, Plaintiff returned to Samaritan Daytop shelter, where he continued to experience the "same racketeering tactics." (*Id*. at 18 ¶ 70.) On April 9, 2023, after doing his laundry, he took a nap, but when he woke up, the laundry room was locked and he could not get his clothes. Plaintiff confronted the shelter staff and at some point he punched a frame, causing it to fall down. The shelter staff forced Plaintiff outside and called the police, and told him he would have to wait for the police to come to retrieve his possessions. Plaintiff, however, went back into the shelter, pushed away the security guard who blocked the doorway, and went upstairs for his belongings. While he was packing his possessions, he was surrounded by at least 20 people who "repeatedly threatened, accosted, and harassed [him]." (*Id*. at 19 ¶ 75.) Feeling provoked, Plaintiff got into a fight with some of the residents and staff members. During the fight, his glasses, cellphone, and suitcase were stolen, which he believes was an attempt to stop him from using his phone to file unemployment insurance claims. Plaintiff returned downstairs with only a backpack and waited outside for the police. When the police came, without hearing

his side of the story, Officer Milton E. Calderon arrested Plaintiff. Plaintiff was transported to the NYPD 75th Precinct and was charged with "fraudulent trumped up charges." (*Id*. ¶ 78.) Plaintiff saw a judge and was sent to Rikers Island, "as a continuation of the Judiciary's attempt to treat him like a criminal and destitute and disenfranchised him." (*Id*.) He spent five days at Rikers Island before he was released on probation. Plaintiff was unable to return to Samaritan Daytop because of an order of protection against him, and DHS refused to assign him to a different shelter.

## G.    Plaintiff's Asserted Claims

Plaintiff brings this action citing to the Fourteenth Amendment to the Constitution and multiple federal statutory provisions: "18 Chapter 95"; 42 U.S.C. § 1981; the Civil Rights Act of 1968; the Fair Housing Act,  42 U.S.C. § 3631; and 18 U.S.C. §§ 241, 245, and 249. (*Id*. at 1-4.) He asserts the following claims:

1. The Plaintiff was intentionally & willfully discriminated against due to willfully chosen preconceived notions & beliefs.
2. The New York Unified Court System was willfully &deliberately in on any conspiracy against [t]he Plaintiff.
3. Personnel at the City & State of New York were aware & apparently involved in said schemes and conspiracies to disenfranchise [t]he Plaintiff under wrong loser justification.
4. The Shelter Staff at Kenton Hall and the Third Street, and the New York Shelter System personnel in general, are willfully and intentionally operating a Criminal Enterprise.
5. The Plaintiff was forced to fight New York Department of Corrections Officers to facilitate his robbery by said Officer's associates.
6. The warrant hold was used to stop [t]he Plaintiff from obtaining his property and to destitute him for the weekend.
7. The Plaintiff was robbed of his property by an Enterprise consisting of several Project Renewal personnel that used criminal methods to rob, intimidate, & retaliate against him.
8. Personnel with the City of New York Police Department were actively assisting members of said Criminal Enterprise who they have known since [t]he Plaintiff was a child.

(*Id.* at 20 ¶ 52.) Plaintiff seeks declaratory relief and money damages

**DISCUSSION**

A.    **Claims Arising in Brooklyn, New York**

Rules 18 and 20 of the Federal Rules of Civil Procedure govern joinder of claims and parties, respectively. Rule 18(a) permits a plaintiff to join as many claims as he has against a particular defendant. *See* Fed. R. Civ. P. 18(a). By contrast, under Rule 20, a plaintiff may not pursue unrelated claims against multiple defendants. *See* Fed. R. Civ. P. 20(a)(2); *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 167 (S.D.N.Y. 2009) (holding that "the mere allegation that Plaintiff was injured by all Defendants is not sufficient [by itself] to join unrelated parties as defendants in the same lawsuit pursuant to Rule 20(a)") (internal quotation marks and citation omitted, alteration in original). Rule 21 of the Federal Rules of Civil Procedure provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21.

Plaintiff asserts claims arising out of his interactions with shelter staff, NYPD officers, state courts, city agencies, and DOC correction officers in Manhattan, Brooklyn, and Rikers Island. Plaintiff's assertions that multiple defendants harmed him in separate incidents in a conspiracy to violate his rights are insufficient to join all of his claims in a single action. *Deskovic*, 673 F. Supp. 2d at 167. The claims neither arise out of the same transaction nor raise any common questions of law or fact and therefore do not comport with Rule 20(a).

Furthermore, Plaintiff has alleged no facts showing why this court is a proper venue for the claims arising from events that allegedly occurred in Brooklyn, New York. Under 28 U.S.C. § 1391(b), a federal civil action may generally be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in

this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Under Section 1391(c), a "natural person" resides in the district where the person is domiciled, and an "entity with the capacity to sue and be sued" resides in any judicial district where it is subject to personal jurisdiction with respect to the civil action in question. *See* 28 U.S.C. § 1391(c)(1), (2).

Plaintiff, who is currently a resident of Bronx, New York, sues the following defendants for the Brooklyn claims: Samaritan Daytop; Yvelyse Marrero; John McDonald; The Doe Fund; Rogers Avenue HDFC; Lawrence McKenzie; David Bell; and Milton E. Calderon. Because he does not plead the residence of any of the individual defendants, the Court cannot assume that all of the defendants reside in New York State. Thus, it is unclear whether venue is proper in this District under Section 1391(b)(1). The Court can assume, however, that venue is proper in the Eastern District of New York under Section 1391(b)(2) because Plaintiff asserts that the alleged events giving rise to his claims against these defendants occurred in Brooklyn, Kings County, New York, which falls within the Eastern District of New York. *See* 28 U.S.C. § 112.

Even if this District is a proper venue, the Court may transfer the case to any other district where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). In determining whether transfer is appropriate, courts consider the following ten factors: (1) the convenience of witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of the unwilling witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; (9) trial efficiency; and (10) the interest of justice, based on the totality of circumstances. *Keitt v. N.Y. City*, 882 F. Supp.

2d 412, 459-60 (S.D.N.Y. 2011); *see also N.Y. Marine and Gen. Ins. Co. v. LaFarge No. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (setting forth similar factors). A plaintiff's choice of forum is accorded less deference where the plaintiff does not reside in the chosen forum and the operative events did not occur there. *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).

Under Rule 21, the Court severs Plaintiff's claims arising from events that allegedly occurred in Brooklyn, including Plaintiff's claims against Defendants Samaritan Daytop, Marrero, McDonald, The Doe Fund, Rogers Avenue HDFC, McKenzie, Bell, and Calderon. Having considered all of the factors relevant under Section 1404(a), the Court transfers those claims to the Eastern District of New York because the underlying events occurred in Brooklyn, where it is reasonable to expect that all relevant documents and witnesses would be located. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) ("District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis.").

## B.    RICO Claim

Plaintiff's remaining claims are asserted against the State of New York, Attorney General James, Project Renewal, Geffner, Randal, Lashley, DOC, DOC Commissioner Molina, Correction Officer Terrel, Police Officer Maye, and Police Officer Rivers. The Court first considers whether the complaint's allegations that these defendants, as Plaintiff repeatedly asserts, engaged in a criminal enterprise and committed racketeering activities in violation of 18 U.S.C. Chapter 95, the chapter of the federal criminal code that contains the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC § 1961 *et seq,* are sufficient to state a civil claim under the RICO statute.

Plaintiff is apparently attempting to assert claims under the civil provision of RICO, 18 U.S.C. § 1964, which "creates a private right of action for individuals to enforce the RICO statute." *Mathon v. Feldstein*, 303 F. Supp. 2d 317, 322 (E.D.N.Y. 2004). The civil RICO enforcement provision states that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] . . . may sue . . . in any appropriate United States district court and shall recover threefold the damages[.]" 18 U.S.C. § 1964(c). In order to state a violation of Section 1962, and thus, a claim under the civil RICO enforcement provision, a plaintiff must allege facts showing: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting § 1962(a)-(c)). Such a person must also "allege that he was 'injured in his business or property *by reason of* a violation of section 1962.'" *Id.* (quoting § 1964(c)) (italics in original).

To state a claim of a civil RICO conspiracy under Section 1962(d), a plaintiff must allege facts showing that the defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 244 (2d Cir. 1999). A plaintiff must also show that "if the agreed upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Id.* at 244-45.

Plaintiff does not provide any facts that would support any claim under civil RICO – either a claim for civil enforcement or one of conspiracy. He essentially alleges that, following incidents in which he was provoked into altercations with shelter staff, NYPD officers would

arrest him, which would result in the lodging of criminal charges against him and his detention in the custody of DOC. Because Plaintiff does not allege facts suggesting that Defendants engaged in multiple acts constituting racketeering activities or made an agreement to form a criminal enterprise, his assertions regarding his interactions with shelter staff, the NYPD, the state-court system, and DOC do not demonstrate a violation of the RICO statute. The Court therefore dismisses Plaintiff's claims under the civil RICO statute for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**C.     Conspiracy Claim**

The Court also considers whether Plaintiff's assertions are sufficient to state a conspiracy claim under 42 U.S.C. § 1985. To state a Section 1985 claim, a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). Furthermore, the conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004) (quotation omitted).

"[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). Claims under Section 1985 must be alleged "with at least some degree of particularity" and must include facts showing that the "overt acts which defendants engaged in . . . were

reasonably related to the promotion of the claimed conspiracy." *Hernandez v. Goord*, 312 F. Supp. 2d 537, 546 (S.D.N.Y. 2004).

Here, Plaintiff fails to allege an agreement or factual details concerning the inception or operation of any conspiracy. He merely offers conclusory allegations that Defendants conspired to violate his rights, which generally includes shelter staff stealing his property and acting in a manner to provoke him into behavior that results in his arrest. The Court therefore finds that Plaintiff's fails to state a conspiracy claim under Section 1985. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## D.    Claims under 42 U.S.C. § 1983

Plaintiff asserts that Defendants deprived him of his constitutional rights, including those under the Fourteenth Amendment. His constitutional claims can be construed as ones asserted under 42 U.S.C. § 1983. Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-57 (1978). To state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### 1.    Claims against Named Defendants

#### a.   Project Renewal, Geffner, Randle, and Lashley

A claim for relief under Section 1983 must allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Private parties therefore generally are not liable under the statute. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello*, 292 F.3d at 323 ("[T]he United States Constitution regulates only the Government, not private parties.").

16

The activity of a private entity can be attributed to the state in three situations: (1) the entity acts using the coercive power of the state or is controlled by the state (the "compulsion test"); (2) the entity willfully participates in joint activity with the state or its functions are entwined with state policies (the "joint action" or "close nexus" test); or (3) the state has delegated a public function to the entity (the "public function" test). *See Fabricant v. French*, 691 F.3d 193, 207 (2d Cir. 2012). The fundamental question under each test is whether the private entity's challenged actions are "fairly attributable" to the state. *Id.* (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

In analyzing whether a private entity acts under color of state law for purposes of Section 1983, the district court begins "by identifying the specific conduct of which the plaintiff complains," rather than the general characteristics of the entity. *Id.* Providing housing is not a public function because it is not the exclusive province of the state. *See, e.g.*, *George v. Pathways to Hous., Inc.*, No. 10-CV-9505 (ER), 2012 WL 2512964, at *4 (S.D.N.Y June 29, 2012) ("It is well established that the provision of low-cost supportive housing is not a 'public function.'"). The fact that an entity receives public funds does not turn private action into state action. *See Rendell-Baker*, 457 U.S. at 840; *see also Ortega v. Samaritan Vill. Myrtle Ave. Men's Shelter*, No. 18-CV-5995 (KAM), 2020 WL 1043305, at *4 (E.D.N.Y. Mar. 4, 2020) ("[T]he provision of homeless services by a private organization, even under contract with the state or where subject to governmental regulation, does not turn the private organization or its employees into state actors." (citation and internal quotation marks omitted)).

Here, Plaintiff brings claims against Project Renewal, the operator of the Kenton Hall and Third Street shelters, and three of its employees – Geffner, Randle, and Lashley. These defendants, however, are private parties who are not alleged to work for any state or other

governmental body. Project Renewal's operation of homeless shelters or receipt of funds from the City of New York is not sufficient to turn it and its employees into state actors. Plaintiff therefore fails to state a Section 1983 claim against Project Renewal, Geffner, Randle, and Lashley. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

> b.  Police Officers Maye and Rivers

Plaintiff sues Police Officer Maye and Rivers, the two officers who arrested him on April 28, 2022, for breaking the window at the Kenton Hall shelter on April 24, 2022. Plaintiff does not explain how these officers violated his rights, only asserting his belief that the arrest "was the start of said [e]nterprise choosing to depict [him] explicitly as a criminal nigger, with the arrest allowing said [e]nterprise the ability to 'legitimize' their discrimination and disenfranchisement of [him]." (ECF 1, at 9 ¶ 13.) He also alleges that he was not provided a *Miranda* warning. The Court considers whether Plaintiff has asserted sufficient facts to state a claim for false arrest against these NYPD officers.[5]

The Court first looks to state law to establish the elements of a false arrest claim under Section 1983. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 925 (2017) ("[T]o flesh out the elements of this constitutional tort, we must look for 'tort analogies.'"); *see also Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (holding that common law principles are meant simply to guide rather than to control the definition of Section 1983 claims and courts should not "mechanically apply" the law of New York State).

---

[5] The Court notes that Plaintiff alleges that, after he was arrested on June 3, 2022, and brought to the 9th Precinct, while questioning him, Supervising Officer Berrios placed his hands on Plaintiff's chest and "use[d] excessive force to force him into sitting down." (ECF 1, at 11 ¶ 21.) Because Plaintiff does not sue Berrios, the Court does not consider whether this assertion is sufficient to state a Section 1983 claim against Berrios.

Under New York law, to state a claim for false arrest, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Liranzo v. United States*, 690 F.3d 78, 95 (2d Cir. 2012). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).

Officers have probable cause to arrest when they "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and citation omitted). "Probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (1994); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (holding that a police officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest").

Plaintiff does not allege facts showing that Maye and Rivers lacked probable cause to arrest him on April 28, 2022. He admits freely that he broke the window at Kenton Hall, which led to his arrest, but he nonetheless asserts that the arrest was part of the criminal enterprise and conspiracy against him. As the Court explains above, however, Plaintiff's belief that the arrest was part of a criminal enterprise against him is not sufficient to state either a RICO or conspiracy claim. Because Plaintiff alleges facts suggesting that there was probable cause for his arrest, any false arrest claims he is asserting must be dismissed for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

Plaintiff's claim that he was not read his *Miranda* rights during the arrest must also be dismissed. The Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), establishes that suspects must be advised of their constitutional rights before interrogation. While a defendant has a constitutional right not to have a coerced statement used against him, the failure to provide *Miranda* warnings does not constitute a Fifth Amendment violation or a violation of federal law. *See Vega v. Tekoh*, 597 U.S. 134, 142-152 (2022); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) (relying on *New York v. Quarles*, 467 U.S. 649, 654 (1984) (a defendant does not have a constitutional right to receive *Miranda* warnings because warnings are only a procedural safeguard designed to protect a person's right against self-incrimination)). A violation of the *Miranda* rules does not provide a basis for a claim under Section 1983. *See Vega*, 597 U.S. at 152 (Miranda does not "confer a right to sue under § 1983"); *Stevens v. Vill. of Red Hook*, No. 20-CV-08152 (NSR), 2022 WL 11970629, at *8 (S.D.N.Y. Oct. 20, 2022) (dismissing alleged *Miranda* violation under *Vega*). Plaintiff's assertion concerning a *Miranda* violation is dismissed for failure to state a Section 1983 claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### c.  Correction Officer Terrel

Plaintiff asserts that, after the April 28, 2022 arrest, he was transferred to Manhattan Central Booking, where Correction Officer Terrel and four other correction officers "forced" him into a fight. (ECF 1, at 9 ¶ 14.) He only sues Terrel with respect to this incident, asserting that after "getting his ass beat[,] Officer Terrel would respond by slamming [him] and breaking 3 of his ribs and applying his whole-body weight on [] Plaintiff, in a clear-cut murder attempt just like George Floyd." (*Id.*)

The Court construes Plaintiff's allegation of being assaulted by DOC employees as asserting an excessive force claim under the Fourteenth Amendment. *See Edrei v. Maguire*, 892

F.3d 525, 533 (2d Cir. 2018). To state such a claim, a plaintiff must allege facts showing that a correction officer engaged in an "exercise of power without any reasonable justification in the service of a legitimate government objective." *Id*. (citation omitted); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (noting that a pretrial detainee asserting an excessive force claim must show only that the force used against him was objectively unreasonable and is not required to prove the defendant's subjective intent, as has been required in cases involving convicted prisoners).

Plaintiff's assertions that he was forced into a fight with Terrel and four other corrections officers resulting in his injury may arguably state an excessive force claim under the Fourteenth Amendment but are currently insufficient to support such a claim. (ECF 1, at 9 ¶ 14.) The Court grants Plaintiff leave to file an amended complaint to provide more facts about the events leading to the fight and how the correction officers forced him into fighting them. He must also name as defendants the four other DOC officers whom he alleges were involved in this incident. If Plaintiff does not know the name of a defendant, he may refer to that individual as "John Doe" or "Jane Doe."

    d.  DOC and Commissioner Molina

Plaintiff's claims against the DOC must be dismissed because an agency of the City of New York is not an entity that can be sued. N.Y. City Charter ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *see also Emerson v. City of New York*, 740 F. Supp. 2d 385, 396 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency."). The Court therefore dismisses the claims brought against the

DOC for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). In light of Plaintiff's *pro se* status, the Court construes the complaint as asserting claims against the City of New York.

Furthermore, although Plaintiff names Commissioner Molina as a defendant, he does not allege facts showing Molina's direct and personal involvement in violating his constitutional rights sufficient to sue Molina in his personal capacity. *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)). Moreover, Molina may not be held liable under Section 1983 solely because he employs or supervises a person who violated Plaintiff's rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."); *see also Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020). Rather, "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official . . . ." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). The Court therefore construes the complaint as asserting only official capacity claims against Molina.

Plaintiff's claims against Molina in his official capacity can be construed as claims against the City of New York as he may be attempting to assert municipal liability claims concerning DOC's policy and practice. *See, e.g.*, *Nassau County Emp. "L" v. Cnty. of Nassau*, 345 F. Supp .2d 293, 298 (E.D.N.Y. 2004) (noting that "[a] claim against a municipal employee in his or her official capacity may be treated as an action against the municipality itself" (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991))).

e.   City of New York

Plaintiff fails to allege facts suggesting that the City of New York itself has a policy, practice, or custom that resulted in a violation of his constitutional right when he was in DOC custody sufficient to state a municipal liability claim. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978))). He does not allege (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of his  constitutional rights. *See Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Rather, Plaintiff asserts that while he was in DOC custody individual defendants violated his rights, but these allegations do "not suffice to plausibly allege the existence of a sanctioned City policy or custom that caused his alleged injuries."). *Jallow v. City of New York*, No. 21-1267, 2021 WL 5121130, at *2 (2d Cir. Nov. 4, 2021).

The Court also construes Plaintiff's assertions about the shelter system in New York City, his interactions with various city agencies, including DHS and the NYPD, and his claims of discrimination as attempts to assert municipal liability claims against the City of New York. Plaintiff does not, however, allege any facts suggesting that the City of New York itself has a policy, practice, or custom concerning shelters, the police, or any other city agencies he came into contact with that resulted in a violation of his constitutional rights. Instead, the complaint outlines Plaintiff's personal experience navigating the shelter system and his broad and conclusory assertions that shelter staff, police officers, and others are continuously conspiring

and discriminating against him. Plaintiff's assertions do not show the existence of a City policy or custom that caused him harm.

Because Plaintiff does not allege facts suggesting that any of the incidents he describes give rise to a plausible inference that the City had a policy or custom that caused a violation of his constitutional rights, he fails to state a Section 1983 claim against the City of New York. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### f.   State of New York and Attorney General James

Finally, Plaintiff names as defendants the State of New York and Attorney General Leticia James. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id*. New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). Plaintiff's Section 1983 claims against the State of New York are therefore barred by the Eleventh Amendment and are dismissed.

The Eleventh Amendment also precludes Plaintiff's claims under Section 1983 for damages against New York State Attorney General Letitia James, who is a New York State official, in her official capacity.[6] *See, e.g., Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d

---

[6] A plaintiff can sue a state official in his or her official capacity, notwithstanding the Eleventh Amendment, if the plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Berman Enterprises, Inc. v. Jorling*, 3 F.3d 602, 606 (2d Cir. 1993) ("[A]cts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be the subject of injunctive or

Cir. 2022) ("[T]he Eleventh Amendment bars the award of money damages against state officials in their official capacities.").

## 2.    Remaining Section 1983 Claims

In addition to the claims asserted against the named defendants, Plaintiff also brings claims under Section 1983 for which he does not name specific defendants. He asserts claims arising out of his residency at various shelters and his failure, at times, to obtain adequate housing. Plaintiff also asserts a number of claims arising out his detention at Rikers Island. The Court addresses those claims below.

### a.   Shelter conditions

Any claims that Plaintiff is asserting pursuant to Section 1983 that are based on shelter conditions and his failure to obtain adequate housing must be dismissed because there is no federal constitutional right to housing, including a shelter system. In *Lindsey v. Normet*, the Supreme Court held that there is no "constitutional guarantee of access to dwellings of a particular quality." 405 U.S. 56, 74 (1972). Furthermore, the government has no "obligation to provide adequate housing." *Richardson v. City of New York*, No. 12-CV-2545 (WHP), 2013 WL 2124176, at *2 (S.D.N.Y Apr. 17, 2012) (internal quotation marks and citation omitted). Plaintiff's allegations about being sent to undesirable shelters where his property was stolen do not state a federal claim because there is no due process right to placement in a particular type of shelter under federal law or New York law. *See Lindsey*, 405 U.S. at 74 ("We are unable to perceive in [the Constitution] any constitutional guarantee of access to dwellings of a particular quality . . . [a]bsent constitutional mandate, the assurance of adequate housing and the definition

---

declaratory relief in federal court." (*citing Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985)). Here, Plaintiff does not allege facts suggesting that James is committing an ongoing violation of federal law or indicate that he is seeking prospective injunctive relief against her.

of landlord-tenant relationships are legislative, not judicial, functions"); *Jenkins v. New York City Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 512 (S.D.N.Y 2009) ("The Plaintiff has no claim for deprivation of property without due process because he does not have a property right to placement in a particular type of shelter under New York law.")

   b.  Conditions of Confinement at Rikers Island

Plaintiff describes a number of conditions that he was allegedly subjected to during his detention at Rikers Island after the April 28, 2023, arrest, including denial of food, freezing temperatures in his dorm, denial of adequate bedding, and placement in a dormitory where he was "jumped by the whole dorm for inquiring about his stolen food." (ECF 1, at 10 ¶ 17.)

The Court considers whether Plaintiff's assertions amount to claims that correction officials were deliberately indifferent to conditions during his confinement that posed a serious threat to his health or safety. As it appears that Plaintiff was a pretrial detainee during the events giving rise to his claims, the claims arise under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). "[A] detainee's rights [under the Fourteenth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

To state such a conditions-of-confinement claim, a plaintiff must satisfy two elements: (1) an "objective" element, which requires a showing that the challenged conditions are sufficiently serious to pose an unreasonable risk to his health or safety, and (2) a "mental" element, which requires a showing that a correction official acted with at least deliberate indifference to the challenged conditions. *Id.*

For the objective element, a pretrial detainee "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health" or safety, which

"includes the risk of serious damage to 'physical and mental soundness.'" *Id.* at 30 (citing *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013), and quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). "[P]rison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125 (internal quotation marks omitted).

For the subjective element, a pretrial detainee must allege "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. The mere negligence of a correction official is not a proper basis for a claim of a federal constitutional violation under Section 1983. *See Daniels v. Williams*, 474 U.S. 327, 335-36 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

1) Denial of food

To amount to a constitutional violation, a deprivation of food or nutrients must create a serious danger to the health of the inmate. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 683, 687 (1978) (holding in the context of the Eighth Amendment, a diet of fewer than 1,000 calories per day would be "intolerably cruel for weeks or months"); *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir. 2002) (holding that placing plaintiff on a nutritionally inadequate restricted diet for fourteen days was likely to cause serious harm); *Dixon v. Fishkill Corr. Fac.*, No. 17-CV-1123 (NSR), 2019 WL 2866489, at *3 (S.D.N.Y. July 2, 2019) (plaintiff's allegations that he did not receive a meal for over 30 hours on three occasions during a single week and that the food he

was served was nutritionally inadequate amounted to a substantial deprivation of food under the Eighth Amendment).[7]

Courts in this Circuit have routinely held that an isolated denial of a meal "does not give rise to a constitutional deprivation." *Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013); *see also Pagan v. Quiros*, No. 11-CV-1134 (DJS), 2014 WL 1057016, at *6 (D. Conn. Mar. 18, 2014) (holding that denial of one meal "does not constitute a substantial or sufficiently serious deprivation of a basic human need.") (citations omitted); *Hankerson v. Nassau Cnty. Corr. Fac.*, No. 12-CV-5282 (SJF), 2012 WL 6055019, at *3 (E.D.N.Y. Dec. 4, 2012) (holding that the denial of one meal "does not give rise to a constitutional deprivation"); *Scarbrough v. Evans*, No. 11-CV-0131 (NAM) (DRH), 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012) (holding that the "denial of a single meal is insufficient to state a claim for relief") (citations omitted).

Plaintiff alleges that he did not receive a meal after his court appearance, but he does not allege any facts suggesting that the denial of this one meal posed a substantial risk of harm to him, or that correction staff acted intentionally or recklessly. *See Darnell*, 849 F.3d at 35. Because Plaintiff fails to plausibly allege an objectively serious deprivation that rises to the level of a constitutional violation, his claim of denial of a meal is dismissed for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

2)  Freezing dormitory

A prisoner's exposure to excessively hot or cold temperature may give rise to a constitutional violation. *See, e.g.*, *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (holding that a prisoner's exposure to "temperatures near or well below freezing for a five-month period"

---

[7] The objective prong of the deliberate indifference standard is the same under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. *See Darnell*, 849 F.3d at 30.

stated an Eighth Amendment claim); *Lopez v. Phipps*, No. 18-CV-3605, 2019 WL 2504097, at *7 (E.D.N.Y. June 17, 2019) ("[C]ourts in this Circuit have held that excessively hot or cold temperature may give rise to a constitutional violation."); *Wingate v. Robert N. Davoren Center*, No. 12-CV-5521 (ALC), 2013 WL 4856573, at *3 (S.D.N.Y. Sept. 10, 2013) ("Many courts, including the Second Circuit, have held excessively hot or cold conditions may be a constitutional violation.") (citation omitted). While there is no "'bright-line durational or severity threshold' that a deprivation must meet," *Collins v. Fischer*, No. 15-CV-103 (KMK), 2018 WL 1626528, at *7 (S.D.N.Y. Mar. 30, 2018) (quoting *Darnell*, 849 F.3d at 32), courts have generally found that allegations of exposure to mildly cold temperatures, or where the exposure to cold was short term, did not support claims of a constitutional deprivation, *see Miller v. Netto*, No. 17-CV-0362, 2019 WL 4646973, at *9 (D. Conn. Sept. 24, 2019) (no constitutional violation based on pre-trial detainee's "expos[ure] to cold temperatures for at most, nineteen hours"); *Brims v. Ramapo Police Dep't*, No. 11-CV-712 (VB), 2011 WL 7101233, at *5 (S.D.N.Y. Dec. 23, 2011) ("Cases where plaintiffs have succeeded on those claims . . . involve allegations of exposure to freezing or near-freezing temperatures for a more prolonged period of time than eleven hours."); *Stevens v. City of New York*, No. 10-CV-5455 (PGG), 2011 WL 3251501, at *4 & n.2 (S.D.N.Y. July 22, 2011) (no constitutional violation when plaintiff alleged that he "was housed in a cell with a broken window – which was 'somewhat' covered by a garbage bag" for up to four days in mid-May).

Here, Plaintiff alleges that he was placed in a "perpetually freezing" dorm at Rikers Island "without adequate clothing and/or blankets," for one night and then he was transferred the next day. (ECF 1, at 10 ¶ 17.) The Court finds that he fails to plausibly allege an objectively serious deprivation that rises to the level of a constitutional violation. Plaintiff's alleged exposure

to freezing temperature for such a short time without any facts suggesting that the conditions posed a risk to his health or that correction staff acted intentionally or recklessly, is not sufficient to allege a constitutional violation. Plaintiff's claim of exposure to the freezing temperatures at Rikers Island is dismissed for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

       3)  Failure to protect

Prison officials are required to take reasonable measures to guarantee the safety of prisoners, including protecting them from harm caused by other prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. A pretrial detainee asserting a failure-to-protect claim under the Due Process Clause of the Fourteenth Amendment must allege facts suggesting that the actual failure to protect was sufficiently serious, and that correction staff acted with at least deliberate indifference. *Darnell*, 849 F.3d at 29.

Here, Plaintiff does not allege facts sufficient to state a failure-to-protect claim. He alleges that during his detention at Rikers Island, he got into several fights with other detainees, and after being transferred to a new dormitory, he was "jumped" because he inquired about his stolen food. (ECF 1, at 10 ¶ 17.) Plaintiff also asserts his belief that correction staff intentionally placed him in danger while protecting the detainees who took his property and assaulted him. However, he does not name as a defendant any individual correction staff member who was personally involved in the alleged violations, nor allege any specific facts to support his conclusory contention that correction officers were intentionally protecting detainees who stole his property and fought him. Plaintiff also fails to allege facts suggesting that any correction staff member knew or should have known that he would be attacked and failed to prevent it. Plaintiff

therefore fails to state a failure-to-protect claim under Section 1983. *See* 28 U.S.C.

§ 1915(e)(2)(B)(ii).

**E.      Claims under 42 U.S.C. § 1981**

42 U.S.C. § 1981 prohibits racial discrimination in, among other things, all contractual

relationships. *See Rivers v. Roadway Express, Inc*., 511 U.S. 298, 304 (1994). To state a claim of

discrimination under Section 1981, a plaintiff must allege facts showing: "(1) [the] plaintiff[] [is

a] member[] of a racial minority; (2) [the] defendant['s] intent to discriminate on the basis of

race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City

of Oneonta, N.Y.*, 221 F.3d 329, 339 (2d Cir. 2000). Accordingly, for a claim of discrimination

under Section 1981, "it is insufficient to merely plead that race was a motivating factor in the

discriminatory action." *Brown v. Montefiore Med. Ctr.*, No. 19-CV-11474, 2021 WL 1163797, at

*5 (S.D.N.Y. Mar. 25, 2021) (citing *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,

140 S. Ct. 1009, 1017-1018 (2020)). Instead, "a plaintiff must initially plead and ultimately

prove that, but for race, [he] would not have suffered the loss of a legally protected right."

*Comcast Corp.*, 140 S. Ct. at 1019.

Plaintiff brings claims under Section 1981, repeatedly asserting that he was discriminated

against on the basis of his race. He does not, however, provide any facts suggesting that his race

was a motivating factor in any of the incidents he describes, much less that, "but for" his race,

the events giving rise to this complaint would not have occurred. Because Plaintiff does not set

forth facts in support of his claim of race discrimination, the Court finds he fails to state a claim

of race discrimination under Section 1981. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## F.    Claims under the FHA

The FHA, 42 U.S.C. § 3601, *et seq*., "broadly prohibits discrimination in housing."[8]

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 93 (1979). To state a claim under the FHA,

a plaintiff must plausibly allege that: (1) he was a member of a class protected by the FHA, and

(2) he suffered an adverse housing action because of his membership in that protected class. *See*

*Mazzocchi v. Windsor Owners Corp.*, No. 11-CV-7913 (LBS), 2012 WL 3288240, at *7

(S.D.N.Y. Aug. 6, 2012).

Plaintiff cites to the provisions of the FHA and alleges that he was subjected to

discrimination in housing because of his race. He describes several incidents where he was not

provided a shelter bed, but none of his allegations suggests that he was subjected to

discrimination in violation of the FHA. Because Plaintiff does not allege any facts plausibly

suggesting that any of the defendants subjected him to discrimination or retaliation in housing on

the basis of any impermissible factor, he fails to state a claim under the FHA. The Court

therefore dismisses Plaintiff's claims under the FHA for failure to state a claim on which relief

may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## G.    Claims under Criminal Statutes

Plaintiff attempts to assert numerous claims under the federal criminal code, including

claims of conspiracy to violate his rights, interference with federally protected activities, and a

hate crime under 18 U.S.C. §§ 241, 245, and 249 and the criminal RICO statute. Plaintiff,

however, lacks standing to bring criminal charges or to initiate a criminal proceeding in this court

because "the decision to prosecute is solely within the discretion of the prosecutor." *Leeke v.*

---

[8] Plaintiff also brings claims under the Civil Rights Act of 1968, which is commonly
known as the FHA. *See* 42 U.S.C. § 3601 *et seq.*

*Timmerman*, 454 U.S. 83, 87 (1981) 86-87 (1981). Nor can Plaintiff or the Court direct prosecuting attorneys to initiate a criminal proceeding, because prosecutors possess discretionary authority to bring criminal actions, and they are "immune from control or interference by citizen or court." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972). Accordingly, the Court dismisses Plaintiff's claims under the federal criminal code for failure to state a claim. *See* 28 U.S.C § 1915(e)(2)(B)(ii).

## H.    State Law Claims

Plaintiff asserts state law claims. A district court may decline to exercise supplemental jurisdiction over state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Because it is not clear whether Plaintiff can state a federal claim, the Court will determine at a later stage whether to exercise supplemental jurisdiction over any state law claims Plaintiff asserts. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.'") (quoting *City of Chicago v. Int'l Coll. of Surgeon*s, 522 U.S. 156, 173 (1997)).

## LEAVE TO AMEND

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has

cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a claim for relief with respect to the alleged incident of excessive force at Manhattan Central Booking, the Court grants him 60 days' leave to amend his complaint to detail this claim. Plaintiff is only granted leave to amend this one claim, and any effort on his part to reassert the claims that have been dismissed may result in the dismissal of this entire action.

Plaintiff is granted leave to submit an amended complaint providing more facts about his claim concerning the use of excessive force against him. First, Plaintiff must name as the defendant(s) in the caption[9] and in the statement of claim those individuals who were allegedly involved in the deprivation of his federal rights. If Plaintiff does not know the name of a defendant, he may refer to that individual as "John Doe" or "Jane Doe" in both the caption and the body of the amended complaint.[10] The naming of John Doe defendants does *not*, however, toll the three-year statute of limitations period governing this action and Plaintiff is responsible for ascertaining the true identity of any "John Doe" defendants and amending his complaint to include the identity of any "John Doe" defendants before the statute of limitations period expires. Should Plaintiff seek to add a new claim or party after the statute of limitations period has expired, he must meet the requirements of Rule 15(c) of the Federal Rules of Civil Procedure.

---

[9] The caption is located on the front page of the complaint. Each individual defendant must be named in the caption. Plaintiff may attach additional pages if there is not enough space to list all of the defendants in the caption. If Plaintiff needs to attach an additional page to list all defendants, he should write "see attached list" on the first page of the amended complaint. Any defendants named in the caption must also be discussed in Plaintiff's statement of claim.

[10] For example, a defendant may be identified as: "Correction Officer John Doe #1 on duty August 31, 2023, at Sullivan Correctional Facility, during the 7-3 p.m. shift."

In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If Plaintiff has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

a) the names and titles of all relevant people;

b) a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

c) a description of the injuries Plaintiff suffered; and

d) the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated his federally protected rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wants to include from the complaint concerning the excessive force claim must be repeated in the amended complaint.

## CONCLUSION

The Court severs, under Rule 21 of the Federal Rules of Civil Procedure, Plaintiff's claims arising from events that occurred in Brooklyn, including Plaintiff's claims against Samaritan Daytop, Yvelyse Marrero, John McDonald, The Doe Fund, Rogers Avenue HDFC, Lawrence McKenzie, David Bell, and Milton E. Calderon, and transfers those claims to the United States District Court for the Eastern District of New York. 28 U.S.C. § 1404(a).

The Court dismisses Plaintiff's claims against the State of New York, Attorney General James, Project Renewal, Edward I. Geffner, Leticia Randal, Robert Lashley, New York City Department of Correction, DOC Commissioner Louis A. Molina, Police Officer Joshua Maye, and Police Officer Raheen Rivers, for failure to state a claim and seeking monetary relief from defendants that are immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(ii)-(iii).

Plaintiff is granted leave to file an amended complaint with respect to his excessive force claim at Manhattan Central Booking that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Second Amended Complaint," and label the document with docket number 23-CV-3969 (LTS). An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, this action will be dismissed for failure to state a claim upon which relief may be granted. All other pending matters in this case are terminated.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

Dated:    January 2, 2024
          New York, New York

                              /s/ Laura Taylor Swain
                              LAURA TAYLOR SWAIN
                              Chief United States District Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

Write the full name of each plaintiff.


-against-

_____

_____

_____

_____

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

_____CV_____

(Include case number if one has been assigned)

**AMENDED COMPLAINT**
(Prisoner)

Do you want a jury trial?
☐ Yes    ☐ No

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other: _____

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name                Middle Initial            Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City                        State                Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other: _____

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 2:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 3:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 4:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

## V.     STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
_____
_____
_____
_____
_____
_____
_____
_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____
_____
_____
_____
_____
_____

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

_____
_____
_____
_____
_____
_____
_____

## VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| Dated | Plaintiff's Signature |

| | | |
|---|---|---|
| First Name | Middle Initial | Last Name |

Prison Address

| | | |
|---|---|---|
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____